Approved: _____
DAVID P. BURNS
Assistant United States Attorney

Before: HONORABLE MICHAEL H. DOLINGER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA           :   COMPLAINT

     -v.-                          :   Violation of
                                       18 U.S.C. § 2339B
NAJI ANTOINE ABI KHALIL,           :

                                   :   COUNTY OF OFFENSE:
          Defendant.                   NEW YORK, NEW YORK
                                   :

- - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     DANIEL McMAHON, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE

     1.  From in or about April 2004, up to and including on or about May 19, 2004, in the Southern District of New York and elsewhere, NAJI ANTOINE ABI KHALIL, the defendant, within the United States and subject to the jurisdiction of the United States, unlawfully and knowingly attempted to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, Hezbollah.

     (Title 18, United States Code, Section 2339B.)

     The bases for deponent's knowledge and for the foregoing charge are, in part, as follows:

     2.  I am a Special Agent with the FBI.  The information in this Complaint is based on my training and experience, my personal participation in this investigation, and information received by me from other law enforcement officers involved in this investigation, including a law enforcement agent acting in an undercover capacity.  This Complaint is also based

on discussions I have had with a confidential witness (the "CW") who has provided reliable information during the course of this investigation. Because this affidavit is being submitted for a limited purpose, I have not included details of every aspect of this investigation. Where conversations are related herein, they are related in substance and in part, unless otherwise indicated.

### Background: Hezbollah Terrorist Organization

3. Based on my training and experience, and my review of information from the U.S. State Department, I am aware that Hezbollah (Party of God), a/k/a "Islamic Jihad," is an international terrorist group which is based in Lebanon. Since its inception in 1982, Hezbollah is known or suspected to have been involved in numerous terrorist attacks against United States and Israeli interests, including the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy annex in Beirut in 1984. Members of Hezbollah were also responsible for the kidnappings and detention of American citizens in Lebanon in the 1980's, and the attack on the Israeli Embassy in Argentina in 1992. In 2003, Hezbollah is believed to have established a presence in Iraq. The group's leader, Secretary General Hassan Nasrallah, has stated in speeches, among other things, that the group's "slogan is and will continue to be death to America." In 1997, Hezbollah was first formally designated by the U.S. State Department as a foreign terrorist organization.

### Arkansas Money Laundering Investigation

4. I have spoken to FBI agents based in the Eastern District of Arkansas who have been involved in a long-term money laundering investigation involving NAJI ANTOINE ABI KHALIL, the defendant, and others. The Arkansas investigation included the use of consensually monitored telephone calls and in-person meetings, as well as court-authorized wiretaps on cell phones used by KHALIL. The CW was actively involved in the Arkansas investigation. Based on my conversations with those agents, and my review of documents related to their investigation, I learned that KHALIL holds dual citizenship in both Lebanon and Canada, and that he is the Chairman and General Manager of New Line Services, an import/export shipping company located in Montreal, Canada.

5. Also based on my discussions with the Arkansas agents, I learned that in or about August 2001, the CW met in Beirut, Lebanon with NAJI ANTOINE ABI KHALIL, the defendant, and an accomplice ("Accomplice-1"). I have reviewed a summary

prepared in the Arkansas investigation of the conversation among KHALIL, Accomplice-1 and the CW -- which was conducted in the Arabic language -- and learned that during that meeting, Accomplice-1 asked the CW to locate persons in the United States who wanted to launder large amounts of money. Accomplice-1 advised the CW that KHALIL would come to the United States or other parts of the world to physically take possession of the money which was to be laundered. Accomplice-1 further explained that the money then would be deposited in Bank Al-Madina, a bank located in Beirut and owned by Saudi Arabian nationals, and then returned to the CW's client.

6. Also during the August 2001 meeting in Beirut, NAJI ANTOINE ABI KHALIL, the defendant, told the CW that he travels all over the world collecting money which is ultimately laundered through Bank Al-Madina in Beirut. KHALIL further stated that his organization had been laundering money for Russian Organized Crime for some time and was using bank accounts at Bank Al-Madina. Based on my discussions with the Arkansas agents, I learned that a subpoena issued to Air France revealed that KHALIL has in fact traveled extensively throughout the world. Indeed, since August 2000, KHALIL has traveled to the following locations: Paris; Montreal; Los Angeles; New York; Merignac, France; Cairo; Milan; Saudi Arabia; Atlanta; Detroit; Ontario; Salt Lake City; London; Budapest; Amsterdam; Dubai and Beirut.

7. Based on my discussions with the Arkansas agents, and my review of documents related to their investigation, I also learned that from in or about May 2002 through in or about April 2004, the CW had numerous telephone conversations with Accomplice-1 and numerous telephone conversations and in-person meetings with KHALIL. During one of the meetings between the CW and KHALIL, which took place on or about June 18, 2002 in Los Angeles, California, the CW introduced KHALIL to an undercover law enforcement officer ("UC-1") who was posing as a heroin trafficker. UC-1 told KHALIL that he was in the drug business and needed KHALIL's help to launder a large amount of bulk cash. KHALIL agreed to move the money for UC-1. After the meeting, KHALIL was surveilled by other agents at a fast food restaurant with a male of Middle Eastern descent who was driving a Mercedes sports utility vehicle. The individual was identified as the owner of an international import/export shipping company located in Inglewood, California.

8. During another meeting that took place on or about September 18, 2003, NAJI ANTOINE ABI KHALIL, the defendant, met with the CW and UC-1 in a hotel room in Los Angeles, California

to engage in a money laundering transaction. On this occasion, KHALIL arrived at the hotel room carrying a black leather satchel bag. UC-1 then entered the hotel room, and he and KHALIL began to discuss packaging money and sites for future money laundering transactions. KHALIL identified Albany, New York as a money pickup spot, but stated that for large amounts of money, he preferred to use Los Angeles. UC-1 provided KHALIL with wire transfer instructions for the return of the laundered money, and then UC-1 and KHALIL left the hotel room and walked over to a car which was under FBI surveillance. At the car, UC-1 gave KHALIL a black luggage bag which contained $100,000 in various denominations.

9. After receiving the $100,000, NAJI ANTOINE ABI KHALIL, the defendant, returned to the CW's hotel room and transferred the money from the luggage bag to KHALIL's black leather satchel. KHALIL told the CW that the largest amount of money he ever picked up was $160 million. KHALIL was surveilled leaving the hotel room with the black leather satchel, and after several stops, arriving at a shipping warehouse in Gardena California. KHALIL took the black leather satchel inside the warehouse.

10. Also during the Arkansas investigation, I learned from the agents that on or about April 27, 2004, the CW placed a consensually recorded telephone call to NAJI ANTOINE ABI KHALIL, the defendant. During that conversation, as instructed by the Arkansas agents, the CW asked KHALIL to come to New York to meet with the CW regarding a shipment of stolen electronics that needed to be smuggled out of the country. KHALIL told the CW that shipping the electronics would not be a problem, and that he did that sort of business all the time. KHALIL said that he could meet with the CW in mid-May 2004.

### The May 2004 New York Meetings

11. On or about May 17, 2004, NAJI ANTOINE ABI KHALIL, the defendant, placed a telephone call to the CW and advised the CW that he (KHALIL) had arrived in the United States and wanted to meet. Based on my participation in this investigation, I know that KHALIL departed on a 10:40 a.m. flight from Montreal, Canada, and arrived in the early afternoon of May 17, 2004, at Newark Airport in New Jersey. During that phone call, the CW and KHALIL agreed to meet later that day at the Marriot Marquis Hotel in Manhattan (the "Marriot").

12. Later that same day, in the afternoon, the CW met with NAJI ANTOINE ABI KHALIL, the defendant, inside a room on the

21st floor of the Marriot. I and other law enforcement officers observed the meeting on a video and audio monitor in an adjoining hotel room. Although the meeting was conducted in the Arabic language, portions of the conversation were translated for me by an Arabic-speaking interpreter. I also debriefed the CW after the meeting ended. Based on the information provided by the interpreter and my discussions with the CW, I learned the following:

      a.    The CW explained to KHALIL that he had a customer who wanted to ship items from New York to Athens, Greece.

      b.    The CW then informed KHALIL that the shipment was going to Hezbollah (the Lebanon-based terrorist organization) and asked KHALIL whether he could ship to Hezbollah. KHALIL responded that it was not a problem and that he had "friends."

      c.    The CW agreed to introduce his customer to KHALIL the following day.

13. On or about the morning of May 18, 2004, the CW met again with NAJI ANTOINE ABI KHALIL, the defendant, in the same Marriot hotel room. I again observed the meeting as it occurred on a video and audio monitor in the adjoining room. Based on the information provided by the interpreter during the meeting and my discussions with the CW after the meeting, I learned the following:

      a.    During the meeting, the CW specifically informed KHALIL that the items his customer needed to be shipped to Athens, Greece, were night-vision goggles. When KHALIL asked why the equipment was being sent to Athens, the CW said that his customer's "people" were in Athens. KHALIL then speculated that the equipment would be transported by yacht from Greece to Beirut, Lebanon.

      b.    KHALIL told the CW that a license was needed to ship these items outside the United States, and that the customer would not have a problem.

      c.    KHALIL again acknowledged that he had no problem shipping items to Hezbollah.

      d.    At the end of the meeting, KHALIL agreed to meet the CW's customer to discuss the logistics of shipping the night-vision equipment to Athens.

14. Later that same day, the CW met again with NAJI ANTOINE ABI KHALIL, the defendant, in the same Marriot hotel room. This time, the CW was accompanied by UC-2, another undercover law enforcement agent who was posing as the CW's customer. I again observed the meeting as it occurred on a video and audio monitor in the adjoining room. Based on the information provided by the interpreter during the meeting and my discussions with the CW and UC-2 after the meeting, I learned the following:

      a.    The CW introduced UC-2 to KHALIL as his customer.

      b.    UC-2 explained that he wanted KHALIL to ship night-vision goggles and infrared aiming devices to Athens, Greece. UC-2 provided KHALIL with the point of contact and address of individuals who would receive the shipment in Greece.

      c.    Also during the conversation, UC-2 requested a bill of lading from KHALIL. However, UC-2 made clear that UC-2 did not want descriptions of the actual items on the bill of lading because he did not have the proper licensing to export the equipment. UC-2 also instructed KHALIL not to put UC-2's name on the bill of lading. KHALIL said that he would create a fictitious bill of lading so that the items and UC-2 would not be revealed.

      d.    KHALIL and UC-2 also discussed the dimensions of the box that contained the night-vision goggles and infrared aiming devices. UC-2 informed KHALIL that the equipment had to be sent by air, because shipment by sea posed the risk of damaging the equipment due to the salt air and water. UC-2 asked KHALIL how much the transaction would cost, and KHALIL said that he would determine a price and call UC-2 back in approximately one hour to let

6

him know.

15. After this meeting, other agents conducted surveillance of KHALIL leaving the hotel. After he left the hotel, KHALIL was picked up by another individual ("Accomplice-2"), who was driving a green minivan. Accomplice-2 is an employee of a shipping and logistics company based in Brooklyn, New York.

16. A little over an hour after NAJI ANTOINE ABI KHALIL, the defendant, left the Marriot, the CW received a telephone call, which was recorded pursuant to a court-authorized wiretap, from KHALIL. Surveillance conducted by other agents established that Accomplice-2 was present with KHALIL during this call. Based on my conversations with the CW, I learned that during the telephone call, KHALIL informed the CW that his fee for shipping the electronic equipment to Greece was $5,000. KHALIL also insisted that the CW have his customer prepare a detailed itemization of the items to be shipped. A few minutes later, the CW called KHALIL back. This telephone call was also recorded. The CW handed the telephone to UC-2, who then spoke to KHALIL. Based on my conversations with UC-2, I learned that during the call, UC-2 asked KHALIL why KHALIL wanted a list of the items when UC-2 didn't want any records of the nature of the shipment. KHALIL ultimately explained that he wanted the list for his protection in case there was a dispute about the number of items received in Greece. During other phone calls, which were also recorded, between UC-2 and KHALIL that same night, KHALIL asked UC-2 whether the crate containing the night-vision goggles and infrared aiming devices would fit inside a minivan. UC-2 said that it would. UC-2 and KHALIL agreed to meet the following morning so that KHALIL could pick up the crate and UC-2 could pay KHALIL for shipping the items to Greece.

17. After UC-2 and NAJI ANTOINE ABI KHALIL, the defendant, completed their telephone calls, KHALIL made several telephone calls to Accomplice-2. These calls were intercepted pursuant to court authorization, and I have reviewed preliminary written summaries of these calls. During one of these calls, Accomplice-2 told KHALIL that he needed to know the value of the "goods," because if the value was over $2,000, there may be a problem as the goods would have to be cleared by Customs. Accomplice-2 then said that he needed to see the goods. In a subsequent call, KHALIL told Accomplice-2 that "it" (the value of the goods) would be around $11,000 to $12,000. Accomplice-2 again explained that there was a law requiring Customs to check any packages having a value of over $2,000. KHALIL then instructed Accomplice-2 to "put" down that the package had a

7

value of $1,950. Accomplice-2 asked how many items were involved, and KHALIL said that he would not know until he saw the items the following morning.

       18. On or about the morning of May 19, 2004, NAJI ANTOINE ABI KHALIL, the defendant, called the CW and asked where he should meet up with UC-2. This telephone call was recorded pursuant to a court-authorized wiretap. The CW told KHALIL that UC-2 would meet KHALIL at 44th Street and 12th Avenue in Manhattan. After that telephone call, other FBI agents observed KHALIL riding in the front passenger seat of a green minivan. The minivan again was being driven by Accomplice-2. Agents observed Accomplice-2 drive the minivan to and park in front of the loading dock of Manhattan Mini Storage located on 645 44th Street in Manhattan, where UC-2 was waiting. KHALIL got out of the minivan and met with UC-2. When UC-2 complained that KHALIL had brought a third party to their meeting, KHALIL explained that the other individual -- Accomplice-2 -- was a close friend of ten years, and that KHALIL trusted him.

       19. NAJI ANTOINE ABI KHALIL, the defendant, and Accomplice-2 then met with UC-2 on the loading dock of the storage facility. KHALIL introduced Accomplice-2 to UC-2. Accomplice-2 then handed UC-2 a shipping company business card in Accomplice-2's name. Throughout his meetings with KHALIL and Accomplice-2 on May 19, 2004, UC-2 was wearing a concealed recording device. Next, UC-2, KHALIL and Accomplice-2 got onto an elevator to go to the third floor of the storage facility where the night-vision goggles, infrared aiming devices and other night-vision equipment had been stored inside a crate. Specifically, the following items were contained inside the crate:

       a.   two ITT Industries Night-vision, model "Night Quest G3" monoculars;

       b.   eight ITT Industries night-vision goggles, models 5000 ULB, NQ6001, AN/PVST, F5001 US, F5001J, PVS-7B, AN/PVS-7;

       c.   one Astroscope night-vision module, model 9300 XL; and

       d.   three Insight Technology Inc. Infrared Aiming Lights, model AN/PEQ-2A, class IIIB.

       20. During the elevator ride, in the presence of NAJI ANTOINE ABI KHALIL, the defendant, UC-2 handed Accomplice-2 a

handwritten list describing the equipment that was to be shipped to Greece. The list identified each of the items as "Generation 3." Based on conversations I have had with a Commerce Department agent, I have learned that "Generation 3" is the highest level of night-vision technology and cannot be exported without a license.

21. When NAJI ANTOINE ABI KHALIL, the defendant, UC-2 and Accomplice-2 arrived on the third floor of the storage facility, UC-2 unlocked a storage bin containing five wooden crates, one of which contained the night-vision equipment. The crate containing the equipment was then opened by UC-2, and UC-2 showed both KHALIL and Accomplice-2 samples of the night-vision goggles and infrared aiming devices. When UC-2 offered to allow Accomplice-2 to test the equipment, Accomplice-2 responded that he didn't need to because he had military experience and knew what the items were. Accomplice-2 also stated that he had access to these types of night-vision goggles. KHALIL, however, did try on the night-vision goggles and observed the beam emitted from the infrared aiming device. Based on my participation in this investigation, I know that the infrared aiming devices are mounted on M-16 and other military rifles for target acquisition purposes when using night-vision goggles.

22. UC-2 and NAJI ANTOINE ABI KHALIL, the defendant, then closed and secured the wooden crate and placed the crate on a push cart to be brought down to the minivan. Once the crate was loaded onto the push cart, Accomplice-2 wheeled the cart towards the elevator. At that time, UC-2 handed KHALIL $2,500 in cash and told KHALIL that the remaining $2,500 would be provided after the delivery arrived in Greece. The crate was brought down to the loading dock and then to the street level where the green minivan was parked. KHALIL and Accomplice-2 placed the crate into the minivan and closed the doors. KHALIL and Accomplice-2 were then placed under arrest. (Accomplice-2 has been charged in a separate criminal Complaint for conspiring to violate the export laws.)

23. After NAJI ANTOINE ABI KHALIL, the defendant, was arrested, he was taken to the FBI's New York office and was advised of his <u>Miranda</u> rights. KHALIL waived his rights, and made the following statements, among others, in sum and substance:

       a. KHALIL stated that he had agreed to send the equipment to Hezbollah; and

       b. KHALIL knew that Hezbollah was a violent organization that killed people.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named individual and that he be arrested and imprisoned, or bailed, as the case may be.

_____
DANIEL McMAHON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
24th day of May, 2004

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

HON. MICHAEL H. DOLINGER
United States Magistrate Judge
Southern District of New York

10